# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION AT FRANKFORT

**[Filed Electronically]**

| | |
|---|---|
| **LESLIE GLASS, Administratrix of the Estate of her son, Dylan Harrison Stratton, deceased** | ) ) ) |
| **PLAINTIFF** | ) |
| **v.** | ) ) |
| **FRANKLIN COUNTY, KENTUCKY** <br> Serve:      **Huston Wells** <br>          **County Judge-Executive** <br>          **321 West Main Street** <br>          **Frankfort, KY  40601** <br> **-and-** | ) ) ) ) ) ) ) |
| **RICK ROGERS, individually** <br> Serve:      **Franklin County Regional Jail** <br>          **400 Coffee Tree Road** <br>          **Frankfort, KY  40604** <br> **-and-** | ) ) ) ) ) ) |
| **KELLY HAYES, _____ JOHNSON, _____ BENEDICT, _____LEWIS, _____ McDONALD, _____WILLARD, _____ HEDGER, MINDY CARENDER, ROBERT KELTY, _____ KING, _____ RINGER, _____JIMINEZ, _____SAMS, _____ WETHINGTON, _____ PULLER, _____ TALARICO, COLIN WELLS, _____ GARLAND, _____RIDDLE, _____COLE, MEGAN LEWIS, JONATHAN FENSTERMAKER, ANTHONY PULLEN, BRANDON PRICE, DARLENE YOUNT, _____CAMPBELL, AMANDA NWAMKPA, _____ MAY, _____ McGUIRE, _____ HUFF, _____ COLE, _____ HOLLAND, JENNY HOCKENSMITH, TARIN TEJADA, all individually** <br> Serve:      **Franklin County Regional Jail** <br>          **400 Coffee Tree Road** <br>          **Frankfort, KY  40604** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

-and-                                                )
                                                     )
NEW VISTA OF THE BLUEGRASS, INC.                     )
(F/K/A BLUEGRASS.ORG, INC.)                          )
Serve:          Paul R. Beatrice                     )
                1351 Newtown Pike                    )
                Building 1                           )
                Lexington, KY 40511                  )
-and-                                                )
                                                     )
KELLEY FORD, LPCC, individually                      )
Serve:          1351 Newtown Pike                    )
                Building 1                           )
                Lexington, KY 40511                  )
-and-                                                )
                                                     )
SOUTHERN HEALTH PARTNERS, INC.                       )
Serve:          CT Corporation System                )
                4169 Westport Road                   )
                Louisville, KY  40207                )
-and-                                                )
                                                     )
STACY JENSEN, APRN, individually                     )
Serve:          Franklin County Regional Jail        )
                400 Coffee Tree Road                 )
                Frankfort, KY  40604                 )
-and-                                                )
                                                     )
SABINA TRIVETTE, LPN, individually                   )
Serve:          Franklin County Regional Jail        )
                400 Coffee Tree Road                 )
                Frankfort, KY  40604                 )
-and-                                                )
                                                     )
LINDA BOLINGER, LPN, individually                    )
Serve:          Franklin County Regional Jail        )
                400 Coffee Tree Road                 )
                Frankfort, KY  40604                 )
                                                     )
                DEFENDANTS.

# **COMPLAINT**

2

## I. Introduction

1.      Plaintiff Leslie Glass, Administratrix of the Estate of her son, Dylan Harrison Stratton, deceased, complains of the misconduct of Defendants named in the caption above.  As more specifically set forth below, Dylan, after his incarceration at the Franklin County Regional Jail ("the Jail") and while a pretrial detainee, developed obviously serious medical needs to which Defendants responded in a manner that was objectively unreasonable, deliberately indifferent, intentional, malicious, grossly negligent and negligent.   As a consequence, Dylan, who was only 21 years old, experienced severe mental and physical pain and suffering and then died.  It is the purpose of this action to recover the actual damages Dylan's estate sustained as a result of Defendants' misconduct, and punitive damages to punish Defendants' conduct and forever deter its repetition.

## II.  Jurisdiction and Venue

2.      Plaintiff seeks damages from Defendants under the Civil Rights Act of 1871, 42 U.S.C. §1983, for gross and unconscionable violations of the rights, privileges and immunities guaranteed Dylan by the Fourth, Eighth and Fourteenth Amendments to the Constitution of the United States.  Accordingly, this Court has jurisdiction of this case pursuant to the provisions of 28 U.S.C. §§1331 and 1343.  Plaintiff also seeks damages for Defendants' intentional infliction of emotional distress, negligence, gross negligence, battery, and wrongful death.  Franklin County, Kentucky is the location of all acts pertinent to this suit, and venue is therefore proper in this Court.

## III.  Parties

3.      Plaintiff is a resident of Anderson County, and was appointed administratrix of Dylan's Estate by the Franklin County District Court on January 29, 2019.

3

4.     Defendant Franklin County, at all times mentioned herein, employed, was responsible for the establishment of policies either formally or by custom for, and was responsible for the training, supervision and conduct of, Jailer Rick Rogers and the officers, employees, and medical professionals responsible for inmates in the Jail.  Franklin County was also statutorily responsible for the care and custody of inmates in its Jail pursuant to KRS Chapter 441, *et. seq.*

5.     Defendant Rick Rogers was at all times mentioned herein acting individually and/or in his official capacity as Jailer of Franklin County, and as such established policies either formally or by custom for, and was responsible for the training, supervision and conduct of, the officers, employees, and medical professionals responsible for inmates in the Jail. Rogers was also statutorily responsible for the care and custody of inmates in the Jail, and for the Jail's compliance with KRS 441.045(3) and for providing "necessary care" as defined by KRS 441.045(10).

6.     Defendants Hayes, Johnson, Benedict, Lewis, McDonald, Willard, Hedger, Carender, Kelty, King, Ringer, Jiminez, Sams, Wethington, Puller, Talarico, Wells, Garland, Riddle, Cole, Lewis, Fenstermaker, Pullen, Price, Yount, Campbell, Nwamkpa, May, McGuire, Huff, Cole, Holland, and Hockensmith, were at all times mentioned herein deputy jailers in the Jail, were directly responsible for attending to the medical needs of inmates in the Jail, and personally and directly participated in the mistreatment of Dylan described below.

7.     Defendant New Vista of the Bluegrass, Inc. (f/k/a Bluegrass.Org, Inc.) ("Bluegrass") at all times mentioned herein employed, was responsible for the establishment of policies either formally or by custom for, and was responsible for the training, supervision and conduct of, medical professionals responsible for the inmates in the Jail, including Defendant Kelley Ford, LPCC.

4

8.    Defendant Kelley Ford, LPCC, was at all times mentioned herein an employee of Bluegrass, was directly responsible for attending to the medical needs of inmates in the Jail, and personally and directly participated in the mistreatment of Dylan described below.

9.    Defendant Southern Health Partners, Inc. ("SHP") at all times mentioned herein employed, was responsible for the establishment of policies either formally or by custom for, and was responsible for the training, supervision and conduct of, the medical professionals responsible for the inmates in the Jail, including Stacey Jensen, who is an advanced practice registered nurse ("APRN"), and licensed practical nurses ("LPNs") Sabina Trivette and Linda Bolinger.  Defendant SHP was further required to provide "necessary care" as defined by KRS 441.045(10) under its contract with the Defendant Franklin County.

10.    Defendants Stacey Jensen, APRN, Sabina Trivette, LPN, and Linda Bolinger, LPN, were at all times mentioned herein medical professionals employed or separately contracted by SHP to attend to the medical needs of inmates in the Jail, and personally participated in the mistreatment of Dylan described below.  In addition, Defendant Jensen was responsible for the establishment of policies either formally or by custom for, and was responsible for the training, supervision and conduct of, LPNs Trivette and Bolinger.

### IV.  Nature of Defendants' Conduct

11.    Defendants, individually and in conspiracy with one another, engaged in the conduct described below under color of the law of the Commonwealth of Kentucky and Franklin County.  Defendants knowingly participated or acquiesced in, contributed to, encouraged, implicitly authorized or approved the conduct described below.  The offenses described below resulted from the failure of the county, SHP, and the supervisory officials named above to properly or conscientiously train and supervise the conduct of their employees, and/or to promulgate

5

appropriate operating policies and procedures either formally or by custom to protect the constitutional rights of inmates like Dylan. Defendants' conduct was objectively unreasonable, intentional and grossly negligent, indicated active malice toward Dylan and a total, deliberate and reckless disregard for and indifference to his life and his constitutional and common law rights, and justifies an award of punitive damages in addition to the actual damages his Estate is entitled to recover.

## V. Facts

12. Dylan Harrison Stratton was 21 years old when he entered the Franklin County Regional Jail ("the Jail") the afternoon of Thursday, January 17, 2019, on a drug charge.

13. Dylan was six feet tall and weighed 250 pounds. On admission to the Jail, Dylan reported that he had high blood pressure, took Zoloft and Lisinopril, and used Marijuana and Ecstasy. Dylan was flagged for possible drug withdrawal and was placed in the Jail's detox cell for observation.

14. Drug withdrawal is torturous, agonizing and potentially fatal if not properly monitored and treated. The Jail's written policies and procedures identify drug withdrawal as a medical emergency requiring, at a minimum, administration of first aid and notification of the medical staff. Symptoms of drug withdrawal include nausea, vomiting, diarrhea, sweating, hallucinations, psychosis, paranoia, and seizures, which can lead to life-threatening conditions of dehydration, organ failure, irregular heartbeats, and death unless promptly treated.

15. The night of January 17, 2019, Dylan was flagged for suicide watch, because he was upset by his charge; it was his first time in Jail; his stepfather had recently died; and he was making suicidal statements to his cellmate. Observation logs maintained while Dylan was in detox and on suicide watch appear to indicate that he occasionally refused his meals or did not eat; that

6

he was given a shower at 4:35 a.m. one morning possibly due to profuse vomiting and/or diarrhea; and that he was given a 12-ounce bottle of water by a deputy jailer on another occasion possibly due to concerns over dehydration.  The observation forms utilized by the Jail's deputy jailers do not have coded entries for the signs and symptoms of withdrawal that can include nausea, vomiting, diarrhea, hallucinations, psychosis, paranoia, seizures, and profuse sweating.

16.    On Friday, January 18, 2019, Dylan had a seizure, which can be precipitated by benzodiazepine withdrawal and severe dehydration.  He was also heard screaming and yelling, and making hallucinatory/delusional statements such as, "Please start the car."  He was observed to be rolling on the floor of his cell, and tried to get out of his cell whenever deputy jailers opened the door.

17.    Defendant Talarico contacted Defendant Kelley Ford of Defendant Bluegrass by telephone on January 20, 2019, about Dylan's conduct. Based on Talarico's over-the phone description, Ford believed Dylan was actively psychotic, possibly due to his withdrawal from drugs.  However, she made no recommendation beyond continued observation for his detox issues and use of the "safety chair" (on information and belief, the Jail's restraint chair) as needed.

18.    An entry made by Defendant Trivette in a drug withdrawal flow chart on January 21, 2019, indicated that she was concerned about Dylan's hydration and gave him Gatorade.

19.    On January 22, 2019, Dylan was still exhibiting active psychosis.  At 9:00 a.m. that day, Dylan was unable to meaningfully participate in his video arraignment.  At his video arraignment, Dylan's appearance and the decline in his physical and mental condition so alarmed Judge Kathy Mangeot, Franklin District Court, that she specifically asked the deputy jailers present if Dylan was suffering from withdrawal and was receiving appropriate medical treatment at the

Jail. Judge Mangeot was assured by the deputy jailers that Dylan was being provided appropriate medical care.

20.     Dylan was also scheduled for a preliminary hearing at 1:00 p.m. on January 22, 2019, before Judge Mangeot. However, Dylan was too sick to be transported to the Franklin County Courthouse for his preliminary hearing. Judge Mangeot summoned the deputy jailers to her chambers to again confirm that Dylan was receiving appropriate medical care and attention. Again, Judge Mangeot was assured by the deputy jailers that he was being provided appropriate medical care.

21.     Dylan was again observed rolling on the floor of his cell on January 22, 2019, as if he was swimming, and he was still yelling for someone to "start the car." Defendant Talarico again contacted Defendant Ford at Defendant Bluegrass and informed her of Dylan's condition, but Ford did nothing more than "refer [Dylan] to medical for another medical eval[uation] regarding detox." At some point on January 22, 2019, Defendant Trivette was summoned to Dylan's cell where she found him lying on his side. She instructed him to sit up and drink fluids, and he allegedly "complied slowly."

22.     Although Defendant Stacey Jensen, APRN, was at the Jail on January 22, 2019, she did not see, talk to, or examine Dylan despite his obviously serious physical, mental, and medical condition. There is no evidence that Jensen even reviewed his chart.

23.     On January 23, 2019, Dylan was found unresponsive in his cell at the Jail at 2:46 a.m., and after unsuccessful efforts to revive him, he was pronounced dead at 3:50 a.m. Before being found unresponsive, Dylan does not appear to have received any medical attention at the Jail for his condition beyond an order by Defendant Jensen that his blood pressure be checked monthly. For an extended period of time prior to his death, Dylan was completely naked in his cell, flailing

8

about, reaching for things that were not there and talking to people who were not there. At all times while Dylan was in the detox cell, his actions were being observed by deputy jailers named as Defendants herein with no action being taken on their part to address his emergent physical, mental and emotional condition. All of Dylan's actions were recorded by surveillance videos which were available to all Defendants for review at any time during Dylan's incarceration.

24. In the hours preceding Dylan's death – the evening of January 22, 2019, and extending into the early morning hours of January 23, 2019 -- the on-duty staff of the Jail was roiled, and likely distracted, by the investigation and eventual arrest of Defendant Deputy Jailer Brandon Price at the Jail the night of January 22, 2019, for third degree sodomy felony offense in connection with his alleged sexual assault of a female inmate. Despite Defendants Franklin County's and Rogers' prior knowledge of the allegations against Price, Price had nonetheless been permitted to report for his scheduled shift at the Jail where he shared responsibility for Dylan's custody and care, and where he was subsequently arrested.

25. Dylan would not have died but for Defendants' gross, unconscionable and deliberate indifference to the tortures of his untreated benzodiazepine withdrawal. His body was severely bruised as a result of mistreatment by the Jail's staff, and/or his flailing about in delirium in his cell prior to his death. For a period of time after Dylan was found unresponsive and died, he lay naked in the open doorway of his cell – deputy jailers passed by the scene with nary a glance. The Deputy Coroner noted "bad body odor" in Dylan's cell still present when he arrived.

26. The individual Defendant deputy jailers, were all on duty, at one time or another, during Dylan's incarceration, observed his emergency medical condition, and failed to do anything they were required to do by the Jail's medical emergency services policy. To the contrary, on information and belief, one or more of such deputy jailers verbally abused, harassed, mocked, and

9

tormented Dylan during his suffering.  Prior to Dylan's incarceration at the Jail, Defendants Franklin County and Rogers were put on notice of their deputy jailers' ignorance of and failure to follow the Jail's medical emergency services policy for inmates experiencing withdrawal in depositions taken in *Austin Griffith v. Franklin County, et al.,* Case No. 3:16-cv-077-GFVT (E.D.Ky.).  In each deposition taken in *Gfiffith*, every deputy jailer repeatedly and consistently testified that their only obligation during any period of observation of an inmate under the jail's policy regarding detox was to look for "living, breathing, flesh," with no indication that anything observed would be conveyed to medical staff.

27.    APRN Jensen, LPN Trivette, and LPN Bolinger were all on duty, at one time or another, during Dylan's incarceration.  They knew or should have known of his emergency physical, mental, and medical condition, and they failed to do anything they were required to do by SHP's written drug withdrawal policies.

28.    SHP is a Chattanooga-based, for-profit jail health care company.  SHP's business custom and practice, in order to maximize its profit, is to staff jails with unsupervised licensed practical nurses ("LPNs") like Defendant Trivette and Defendant Bolinger who can neither diagnose nor treat inmate illness and are unfamiliar with SHP's written policies and practices.  The SHP policies, procedures, and protocols that were flagrantly violated in Dylan's case include, but are not limited to, its policies concerning care of inmates with chronic conditions and special needs, and its policies, procedures and protocols for inmates who are suicidal and/or experiencing drug or alcohol withdrawal.  Prior to Dylan's incarceration, SHP was put on notice of its employees ignorance of and failure to follow its written policies, procedures and protocols for inmates experiencing withdrawal in depositions taken in *Finn v. SHP, et al.*, Case No. 1:10-CV-016 (W.D.Ky.), *Shadrick v. SHP, et al.*, Civil Action No. 4:11-cv-033 (W.D.Ky.), *Rice v. SHP, et al.*,

10

Civil Action No. 5:14-cv-181 (E.D.Ky.), and *Griffith, supra*.  The inmates in *Finn*, *Shadrick,* and *Rice* all died as a consequence.  Although the inmate in *Griffith* survived, that case involved SHP's same operations in the same Jail, and some of the same employees, which are involved in this case.

29.     Defendant Jensen, an advanced practice registered nurse ("APRN") is SHP's Medical Director at the Jail.  However, she visits the Jail only once every two weeks; she exercises no supervision over Defendant Trivette, LPN, and Defendant Bolinger, LPN; and she has not even read SHP's policies and procedures.  Beyond visiting the Jail once a week to see patients the LPNs believe she needs to see and to sign charts, Jensen performs none of the duties of the Medical Director set forth in SHP's policies and procedures or in SHP's contract with the physician that filled the position before Defendant Jensen.

30.     Defendant Trivette and Defendant Bolinger appear to be the only medical professionals who were in a position to provide Dylan any medical attention at the Jail during his incarceration.  However, neither can diagnose or treat a patient's medical condition without the involvement of a physician or APRN.  SHP policies require that a provider be involved in an inmate's withdrawal, but there is no documentation that indicates that Trivette or Bolinger contacted Jensen or any other medical professional about Dylan's withdrawal symptoms before he was found unresponsive.  SHP policies and procedures also require that a detailed drug withdrawal flow chart be maintained for every inmate in detox, by which an inmate's baseline condition is established on admission to the Jail, and any deterioration in their condition be determined in time for more intensive treatment and intervention.

31.     SHP's drug withdrawal flow chart form includes the following entry as a reminder to its nurses:

> Document all findings once per shift (*if shift is 12 hours – at least twice per shift*).
> Report all findings to your Medical Director, especially if patient is not progressing

11

well.  ***If patient experiences changes or deterioration is noted, notify your Physician immediately for further orders.***  The Medical Director to (sic) review and sign form at next Physician Sick Call.

\*         \*         \*

*Withdrawal can be life-threatening.  Based on your documented assessment, is patient's condition deteriorating?  Has Provider been contacted to receive additional orders if symptoms are increasing?  Does patient need to be sent to the local emergency room for more intensive treatment?*

(Italics and bold-face in original.)

32.     Defendant Trivette filled out a drug withdrawal flow chart for Dylan just twice during his 5½ days in the Jail: once at 7:30 a.m. on January 18, 2019, and once at 8:19 a.m. on January 21, 2019.  As referenced above, the last entry made by Trivette the morning of January 21, 2019, indicates that she was concerned about Dylan's hydration and had purportedly given him glucose.  This was the single page drug withdrawal flow chart given to the Franklin County Deputy Coroner during his investigation of Dylan's death, and it was included in the medical records copied by Defendant Trivette and attested by her to be a complete and true copy of Dylan's medical chart at the jail at the time of his death.  These medical records were subsequently provided to the Medical Examiner's Office for purposes of Dylan's autopsy.

33.     However, Defendant SHP subsequently produced an additional two-page drug withdrawal flow chart for Dylan in which Defendant Trivette purportedly made entries at least once and sometimes twice a day for every day of Dylan's incarceration.  This drug withdrawal flow chart was obviously created after Dylan's death, as it was not included in the certified records provided to the Deputy Coroner on January 23, 2019.  Among other things, this chart includes:

- Entries purportedly made by Trivette at 8 a.m. on January 18, 2019, that differ from those made by Trivette at 7:30 a.m. on January 18, 2019, in the chart certified by her and given to investigators on January 23, 2019;

12

- Entries purportedly made by Trivette at 7:30 a.m. on January 21, 2019, that differ from those made by Trivette at 8:19 a.m. on January 21, 2019, in the chart certified by her and given to investigators on January 23, 2019;

- No entries evidencing any concern over Dylan's hydration; and

- No entries evidencing any deterioration in Dylan's condition, despite his obviously emergent, psychotic condition, and the obviously significant and progressive decline of his physical, mental, and emotional state as recognized by Judge Mangeot during his video arraignment on January 22, 2019.

Given the material differences in the two charts; the fact that only a single page drug withdrawal flow sheet, with only two entries, was included in the certified medical record given to investigators on January 23, 2019, by Defendant Trivette; and the fact that a two page drug withdrawal flow chart was produced by counsel for Defendant SHP by e-mail on February 21, 2019, this second chart was obviously fabricated in anticipation of this litigation to purposely cover up the failure of Defendants SHP, Jensen, Trivette and Bolinger to follow SHP's clearly applicable policies and procedures, and to mislead the Court and jury.

34. Despite Dylan's obviously serious medical condition when Defendant Jensen was at the Jail on January 22, 2019, Defendants Trivette and/or Bolinger made the diagnostic decision that Dylan's condition was not sufficiently serious to warrant Jensen's attention and did not put him on a list to be seen by Jensen. Jensen was either unaware that there was an inmate in the Jail experiencing severe, emergent drug withdrawal complications when she was there on January 22, 2019, or she simply did not care.

## VI. Causes of Action

### Count I

35.     By virtue of the foregoing, Defendants not only failed and refused to attend to Dylan's obviously serious and life-threatening medical needs, but also used excessive force against Dylan and/or failed to protect him from harming himself in his delirious, hallucinatory state.

36.     Defendants' conduct was intentional, reckless, deliberate, wanton, malicious and/or objectively unreasonable, and was indicative of their total, deliberate, reckless and/or unreasonable disregard of and indifference to Dylan's life as well as his rights and the risk of harm to him occasioned by such conduct.

37.     Plaintiff believes and, after reasonable discovery, will show that Dylan's treatment by Defendants was the result of policies, customs and practices of Franklin County and SHP either written or unwritten, and that such policies, customs and practices were the "moving force" behind Dylan's suffering and death.  Such practices constitute an arbitrary use of government power, and evince a total, intentional, deliberate and unreasonable disregard for and indifference to the lives and constitutional and common law rights of inmates at the Jail, including Dylan, and the wholesale violations of those rights likely to result from the regular and systematic pursuit of such practices.

38.     Dylan's death was also the direct consequence of the failure of Defendant Bluegrass, and the continued failure of Defendants Franklin County, Rogers, SHP and Jensen, to train their subordinates on policies and procedures intended to save the lives of inmates like Dylan experiencing withdrawal, and to provide sufficient supervision to insure that such policies were followed and enforced.

39.     As a result of the foregoing, Dylan, through Defendants' objectively unreasonable, deliberately indifferent and grossly negligent -- if not reckless, intentional and/or malicious -- conduct, was subjected to cruel and unusual punishment and denied due process of law in violation of the Fourth, Eighth and Fourteenth Amendments of the Constitution of the United States and the Civil Rights Act of 1871, 42 U.S.C. §1983.

### Count II

40.     By virtue of the foregoing, the individual Defendants named above were negligent and grossly negligent.

41.     By virtue of the foregoing, Defendants Bluegrass, SHP, Ford, Jensen, Trivette and Bolinger failed to meet the standard of care applicable to their respective medical positions in their care and treatment of Dylan.

### Count III

42.     By virtue of the foregoing, Dylan's estate is entitled to recover for his wrongful death pursuant to KRS 411.130.

### Count IV

43.     By virtue of the foregoing, the individual Defendant deputy jailers battered Dylan.

### Count V

44.     By virtue of the foregoing, Dylan's estate is entitled to recover for the emotional distress intentionally and/or recklessly inflicted upon Dylan by Defendants' extreme and outrageous conduct.

## Count VI

45.    By virtue of the foregoing, Defendants SHP and Bluegrass are liable for their employees' violations of Dylan's state and common law rights pursuant to the doctrines of vicarious liability and *respondeat superior*.

## VII.  Damages

46.    Dylan's suffering and death were preventable, and his estate is therefore entitled to recover for the wanton and unnecessary physical and mental pain and suffering he endured, the loss of his power to labor and earn money, and his death.  Also, Defendants' violations of Dylan's constitutional and common law rights were cruel, malicious, and evinced a total and reckless disregard for his life and those rights, entitling Plaintiff to recover punitive damages from Defendants in order to deter such conduct in the future.

WHEREFORE, Plaintiff requests a trial by jury, and further requests that she be awarded actual and punitive damages, pre- and post-judgment interest, costs, attorneys' fees pursuant to 42 U.S.C. §1988, and all other relief to which he is entitled under law or in equity.

Respectfully submitted,

/s/ Gregory A. Belzley
Gregory A. Belzley
gbelzley@aol.com
Camille A. Bathurst
camillebathurst@aol.com
Aaron Bentley
abentley3b@gmail.com
BelzleyBathurst Attorneys
P.O. Box 278
Prospect, KY  40059
502/292-2452

Michael L. Hawkins
Michael L. Hawkins & Associates, P.L.L.C.
420 Ann Street
P.O. Box 595

16

Frankfort, Kentucky 40602-0595
502/223-3459 Office
502/223-2900 Facsimile
mhawkins@mlhlawky.com

***Counsel for Plaintiff***